870 So.2d 1044 (2004)
Keith A. WILLIAMS and Debra Williams Individually and On Behalf of their Minor Son Keith Williams, II
v.
MEMORIAL MEDICAL CENTER (Formerly known as Mercy-Baptist Hospital), Dr. John N. Udall, Dr. Charles B. Hill, Dr. Victor E. Lunyong, Children's Hospital, Dr. Uwe Blecker, Dr. Elizabeth E. Mannick, Marlene M. Buis and Dr. Eberhard Schmidt-Sommerfeld.
No. 2003-CA-1806.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 2004.
*1046 Harry E. Cantrell, Jr., The Cantrell Law Firm, New Orleans, LA, for Plaintiffs/Appellants.
C. William Bradley, Jr., J. Don Kelly, Jr., Lemle & Kelleher, L.L.P., New Orleans, LA, for Defendants/Appellees, M. Marlene Buis, M.D., Victor Lunyong, M.D., Tenent Health Systems, Memorial Medical Center, Inc. and Professional Liability Insurance Company.
Allison H. Penzato, Mang Batiza Gaudin Godofsky & Penzato, Covington, LA, for Defendant/Appellee, Charles B. Hill, M.D.
Nicole C. Palmisano, Law Offices of Michey S. deLaup, Metairie, LA, for Defendant/Appellee, Children's Hospital.
(Court composed of Judge PATRICIA RIVET MURRAY, Judge TERRI F. LOVE, Judge EDWIN A. LOMBARD).
PATRICIA RIVET MURRAY, Judge.
This is a wrongful death and survival action grounded in medical malpractice. The plaintiffs, Keith A. Williams and Debra Williams, individually and on behalf of Keith A. Williams, II (the "Williams"), appeal the trial court's judgment granting the three motions for summary judgment filed by the defendants and dismissing the claims against all the parties. Based on our de novo review, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND
The alleged malpractice in this case spanned almost the entire life span of the patient, a new-born baby boy named Keith Williams, II; the baby was born on July 17, 1996, and died sometime in 1997.[1] The cause of death apparently was liver failure due to "short gut syndrome." The baby spent the majority of his life in three hospitals where he was treated by numerous physicians.
First, on July 21, 1996, when he was four days old, his parents presented him to the emergency room at Memorial Medical Center (formerly Mercy-Baptist Hospital) with what appeared to be yellow jaundice. He was examined and admitted for treatment.
On July 22, 1996, the baby's conditioned worsened, and the treating neonatologists, Drs. Victor E. Lunyong and Marlene M. Buis, requested a surgical consultation from Dr. Charles B. Hill, a pediatric surgeon. The baby remained in Memorial Medical Center from that date through October 1996; during that period, he apparently was under the care of Drs. Lunyong, Buis, and Hill. The next significant event reflected in the record occurred on October 10, 1996, when Dr. Hill performed an emergency exploratory laparotomy on the baby.
On October 17, 1996, the baby was transferred from Memorial Medical Center to Children's Hospital for a liver biopsy. At Children's Hospital, Dr. John Udall performed the liver biopsy and determined that the baby needed a liver transplant. For that reason, Dr. Udall recommended that the baby be transferred to the University *1047 of Nebraska Medical Center (the "UNMC").
On October 25, 1996, the baby was transferred from Children's Hospital to the UNMC. At UNMC, the baby was treated by Drs. Stuart Kautman (a pediatric gastroenterologist), Stephen Raynor (a pediatric surgeon), and Lewis Pinch (a pediatric surgeon). On October 30, 1996, Dr. Raynor performed surgery on the baby to determine if a transplant was needed. According to the operative report, the preoperative diagnosis was "small bowel obstruction with enterocutaneous fistula, liver failure." The postoperative diagnosis was the same with the addition of "with large intra-abdominal abscess cavity."
On December 19, 1996, the baby was transferred from UNMC back to Children's Hospital. At some point, according to Children's Hospital on April 1, 1997, the baby was discharged as an inpatient and began treatment as an outpatient at Children's Hospital. According to the Williams' allegations, the baby's condition deteriorated further due to the substandard treatment he received at Children's Hospital. As noted, the baby died sometime in 1997.
On July 17, 1997, the Williams filed a proposed complaint of medical malpractice with the Louisiana Patients' Compensation Fund ("LPCF"). In their complaint, the Williams named as defendants Drs. Hill, Lunyong, Buis, Udall, Blecker, Mannick, and Schmidt-Sommerfeld. The Williams also named as defendants Memorial Medical Center and Children's Hospital; these two hospital-defendants were alleged to be vicariously liable for the negligent actions of the physicians whose actions they controlled. All the defendants were alleged to be qualified health care providers under the Louisiana Medical Malpractice Act, La. R.S. 40:1299.47, et seq. The LPCF, however, notified the Williams that only Drs. Hill, Lunyong, and Buis, and Memorial Medical Center and Children's Hospital (hereinafter collectively referred to as "Defendants") were qualified providers.[2]
The parties proceeded with the formation of the medical review panel. The Williams nominated as their panel appointee Dr. Sandra Robinson, a pediatrician. The other two panel appointees were Dr. Faith Hansbrough, a pediatric surgeon, and Dr. Janet Larson, a neonatologist. On September 20, 2000, the medical review panel issued its opinion finding unanimously in favor of the five qualified provider-defendants. As to Children's Hospital and Memorial Medical Center, the panel reasoned that "[t]here is nothing in the record presented to the panel to review to indicate that the hospitals and/or their employees deviated from the standard of *1048 care." As to Drs. Lunyong, Buis, and Hill, the panel gave the following reasons:
1. The care submitted was superlative both medical and surgical.
2. There was complete cooperation between the medical and surgical teams.
3. The timing for the surgery was appropriate.
4. Post-operative course was anticipated and predictable in this pre-term baby.
On November 20, 2000, the Williams commenced the instant suit in Civil District Court against the same defendants and making the same allegations. On July 30, 2001, the Williams filed a supplemental and amended petition adding as defendants the liability insurers of the respective defendants; namely: St. Paul Insurance Company as insurer for Children's Hospital; Professional Liability Insurance Company as insurer for Drs. Lunyong and Buis; and Louisiana Medical Insurance Company as insurer for Dr. Hill.[3] In that amended petition, the Williams also clarify that Memorial Medical Center is now owned by Tenet Health System Memorial Medical Center, Inc.
The allegations of negligence asserted in the original and amended petition included that:
 Memorial Medical Center and Children's Hospital are vicariously liable for the actions of its employees.
 Drs. Lunyong and Buis failed to diagnose the baby's condition during their treatment of the baby at Memorial Medical Center in July to October 1996.
 Dr. Hill failed to perform exploratory surgery when the baby was first brought to the hospital and negligently removed the baby's bowel in the emergency exploratory surgery he performed on October 10, 1996.
 Dr. Udall wrongfully diagnosed the baby as needing a liver transplant after performing a liver biopsy at Children's Hospital on October 17, 1996.
 Children's Hospital's employees failed to perform according to the standard of care for inpatient and outpatient care of the baby both before and after the baby's transfer to UNMC.
In response, Defendants answered, generally denying the allegations of the petitions. Defendants also filed motions to compel the Williams to answer interrogatories seeking, among other things, disclosure of the experts the Williams planned to call at trial to establish the allegations of malpractice pled in their petitions. The Williams responded that they did not have any such expert at the time.
On December 6, 2001, a status conference was held at which attorneys for all the parties were present and at which the trial court set the jury trial in this matter for September 18, 2002, and ordered the Williams to disclose all expert witnesses by March 6, 2002. On March 5, 2002, however, the Williams filed a Motion for Extension of Time to Disclose Expert and for Expedited Hearing. In that motion, they represented to the court that they needed a 120-day extension to disclose the name of the experts they intended to use at trial. Their articulated reason for seeking this delay was that "the principal expert plaintiffs have retained is still reading the medical records which weigh approximately 58 pounds and he will not allow plaintiffs to reveal his name until he is able to issue an intelligent report." Defendants strenuously opposed the requested delay as excessive.
*1049 On April 5, 2002, a hearing was held on the Williams' motion to continue, which the trial court granted. On May 30, 2002, a second status conference was held at which attorneys for all the parties were present and at which the trial court issued a second scheduling order. That order reset the jury trial for February 10, 2003 and required the Williams to disclose all their witnesses, including experts, by September 9, 2002. That order also required the defendants to disclose their witnesses by October 9, 2002 and set a discovery cut-off date of December 20, 2002. In October, Defendants timely filed their witness lists. Given the Williams' failure to file their list of expert witnesses timely pursuant to this second scheduling order, Defendants filed motions for summary judgment. More precisely, three motions were filed: (i) Dr. Hill filed one on October 22, 2002; (ii) Memorial Medical Center and Drs. Lunyong and Buis filed one on October 30, 2002; and (iii) Children's Hospital filed one on November 21, 2002.
In support of their respective motions for summary judgment, Defendants emphasized the failure of the Williams to name any expert. Defendants attached a copy of the medical review panel's favorable opinion as well as a panel member's affidavit. Particularly, Dr. Hill attached a copy of Dr. Hansbrough's affidavit, attesting that Dr. Hill complied with the standard of care. Drs. Lunyong and Buis and Memorial Medical Center attached a copy of Dr. Robinson's affidavit attesting that Defendants complied with the applicable standard of care. Likewise, Children Hospital attached a similar affidavit by Dr. Robinson, who, as noted above, was the Williams' panel nominee.
Meanwhile, in November 2002, apparently prompted by these summary judgment motions, the Williams filed (two months late) their first witness list, naming the three doctors who treated the baby at UNMC as their experts; to wit: Dr. Kaufman (pediatric gastroenterologist), Raynor (pediatric surgeon), and Pinch (pediatric surgeon). Shortly thereafter, the Williams filed an amended witness list adding as an expert, Dr. Robert Koppel, a neonatologist.
Because the three summary judgment motions raised virtually identical issues, the trial court treated them together. The trial court initially set the hearing date on the three motions for December 6, 2002. In response, the Williams filed a motion to continue that hearing date. In support, they alleged that to properly oppose the pending motions they needed a neonatologist's expert testimony. They further alleged that they had been in contact with Dr. Koppel, that he was willing to provide evidence in opposition to Defendants' motions, and that he had "not yet been able to prepare an opinion report." The Williams attached to their motion an e-mail from Dr. Koppel, which stated that he had only been provided with an "abstract of the case," enumerated the voluminous medical records he would require to provide such a report, and set forth the fees he would charge for such a medical record review. As Defendants aptly characterize this e-mail, it was simply a fee retainer letter. Responding to the Williams' motion to continue, Defendants filed a motion to exclude the newly disclosed expert witness from testifying at trial given the Williams' failure to comply with the court's scheduling order.
On December 6, 2002, the trial court held a hearing on Defendants' three summary judgment motions, motion to exclude the Williams' expert witness, and the Williams' motion to continue. At the close of the hearing, the trial court declined to extend the cut-off dates or to upset the trial date then set for February 10, 2003 or *1050 to exclude the Williams' expert witness. However, the court ordered that the Williams produce the expert reports in their possession, which they apparently referred to in argument, to the defendants by the close of that business day. The trial court further limited the Williams to the two expert witnesses that they identified to the court in oral argument, namely Dr. Raynor (pediatric surgeon) and Dr. Koppel (neonatologist). The trial court still further ordered that the Williams' expert witnesses be made available for deposition before January 10, 2003. Finally, the trial court reset the hearing on Defendants' three summary judgment motions for January 24, 2003.
On December 20, 2002, the Williams filed a motion to substitute expert witness, seeking to substitute, Dr. Stuart Bohrer, a pediatric surgeon from New York, in place of Dr. Raynor, the UNMC pediatric surgeon. In support of this motion, the Williams represented that "Dr. Raynor has recently indicated he will be unavailable for a deposition through much of January 2003 at least, whereas Dr. Bohrer is available." On that same date, the Williams filed a motion to extend the deposition discovery cut-off date or to continue trial and to re-set discovery cut-off dates. As noted above, the trial had been set for February 10, 2003, and the discovery cut-off date for December 20, 2002, which was the same date this motion was filed. In support, the Williams represented that they were "having difficulty securing Defendants' cooperation in scheduling depositions of their expert witnesses" and that they were "in the process of scheduling the depositions of their experts in Nebraska in January 2003."
Opposing the Williams' motion to substitute expert witness, Defendants obtained and submitted affidavits from the two UNMC doctors, Drs. Raynor and Kaufman. Each of the UNMC doctors attested: (i) that he had treated the Williams' baby in October and November 1996 at UNMC; (ii) that he had neither been retained as plaintiffs' expert, nor had any intent of serving as plaintiffs' expert in this matter; and (iii) that he had not stated that he believed that Defendants breached the applicable standard of care in treating the Williams' baby in 1996.
On January 7, 2003, the Williams produced to Defendants a report from their newly retained neonatology expert, Dr. Koppel. In that report, Dr. Koppel expressed his opinion that the neonatology defendants, Drs. Lunyong and Buis, had not breached the applicable standard of care. Particularly, Dr. Koppel noted the neonatologists were presented with two options when presented with abdominal distention in a newborn baby; they could have either: (1) independently ordered an upper GI contrast study to rule out malrotation, or (2) consulted a pediatric surgeon. Continuing, he opined that they complied with the applicable standard of care by selecting the latter alternative and consulting with Dr. Hill, a board-certified pediatric surgeon. Indeed, he commented that Drs. Lunyong and Buis "provided dedicated care to support this infant through his many complications." Dr. Koppel further noted that Dr. Hill had staff privileges at both Memorial Medical Center and Children's Hospital and that he could have arranged an earlier transfer if he felt the staff and facilities at Memorial Medical Center were inadequate for the baby's needs. Finally, Dr. Koppel concluded his report by noting he had arranged for Dr. Bohrer, a pediatric surgeon, to review this matter. As noted above, the Williams filed a motion to add Dr. Bohrer as an expert witness in this matter.
On January 17, 2003, the Williams filed an opposition to the pending summary *1051 judgment motions. In it, they noted they had received Dr. Bohrer's preliminary report, albeit admittedly not in proper affidavit form, in which he expressed his opinion that the initial diagnosis of necrotizing enterocolitis by Drs. Lunyong and Buis appeared to be incorrect and that "[i]f, in fact, the child had a midgut volvulus (as a result of the malrotation), the protracted medical course and eventual death were avoidable by early surgical intervention." Dr. Bohrer's report further expresses his opinion that this determination "cannot be made without further discovery." That further discovery, the Williams explained, required taking the depositions of the neonatolgist, Drs. Lunyong and Buis, and the operating surgeon at UNMC, Dr. Raynor. The Williams further stated in their opposition that Dr. Bohrer's statement was confirmed by correspondence from Effie Moten, M.D., which they attached, in which she states that the studies done at UNMC "suggested that the child had a rotated bowel, a condition that might have been the origin of Keith's problems." Although that correspondence quotes Dr. Raynor's operative report, it adds the emphasized sentence not found in the original report; particularly:
What would appear to be the large cavity on the upper GI study was a wide-open abscess cavity with disrupted loops of bowel emptying into it. There was a stricture of the sigmoid colon with a fistula going to the abscess cavity. This is the point where the bowel was obstructed. There were disrupted loops of what appeared to be distal ileum open into the abscess cavity within the peritoneal cavity. The ascending colon seemed viable. The proximal transverse colon was stenotic, or closed and I could identify no distal transverse or descending colon. The sigmoid colon was present with the fistula as previously noted. We did find 40 cm of normal-looking bowel distal to the ligament of Treitz. The liver was green, large, and very firm to palpation. (Emphasis added).
Due to the trial judge's illness, the hearing on the Defendants' summary judgment motions that was set for January 23, 2003 was reset for January 31, 2003. On that date, the trial court conducted a hearing on the summary judgment motions. At that hearing, Defendants introduced an affidavit by Dr. Raynor, dated January 30, 2003, in which he attested that during the surgery he performed at UNMC in October 1996 he "did not identify any malrotation of the intestine," that his "operative findings are not consistent with a malrotation with midgut volvulus," and that he "hold[s] these opinions to a reasonable degree of medical certainty." Attached as an exhibit to his affidavit was his operative report, quoted above.
At the end of the January 31, 2003 hearing, the trial court indicated that it was "included to grant the summary judgments." However, the trial court instead decided to take the matter under advisement given that the depositions had not yet been taken and given that this case involved the death of a baby. On February 6, 2003, the trial court rendered a judgment ordering that the Defendants' three pending summary judgment motions be continued and reset for March 14, 2003. The trial court further ordered that the Williams had thirty days to take the depositions of Drs. Raynor, Hill, Buis, and Lunyong.[4]
On March 11, 2003, the Williams once again filed a motion to continue the hearing *1052 date on Defendants' motion for summary judgment set for March 14, 2003. In support, they represented that they had taken the deposition of Dr. Hill in February 2003, but claimed they were unable to prepare their defense of the motions without the transcript of that deposition, which would not be available for at least two weeks. Additionally, they claimed that the depositions of Drs. Lunyong and Buis had been scheduled for March 6, 2003, but the defendant-doctors' attorney informed them he would be unavailable for that date and requested a continuance to March 13, the day before the summary judgment hearing. Again, the Williams claimed that they could not prepare their defense without the transcript from such depositions. On March 10, 2003, the trial court, without holding a hearing, ordered that the hearing date on Defendants' motions for summary judgment be continued to May 16, 2003. For some reason, the actual hearing date was reset for May 30, 2003.
On May 27, 2003, three days before the scheduled hearing, the Williams filed a memorandum in opposition to the motions for summary judgment in which they urged that the trial court continue the hearing because they were unable to depose Drs. Lunyong and Buis. Countering, defense counsel (i.e., counsel for Drs. Lunyong and Buis) referred to correspondence reflecting that on February 25, 2003, he offered to produce his clients for their depositions on March 12, 2003, which was fifteen days notice. On April 23, 2003, defense counsel offered to produce Dr. Buis for either May 1st or 2nd, 2003, and Dr. Lunyong for May 2, 2003. On May 6, 2003, defense counsel offered to produce Dr. Buis for May 8, 2003. According to defense counsel, the Williams' attorney failed to respond, and defense counsel appeared on May 2nd with Dr. Lunyong and on May 8th with Dr. Buis and took process verbals.
After being continued three times, the trial court ultimately decided the three motions for summary judgment on May 30, 2003. At that hearing, the Williams orally re-urged their request for a continuance based on their inability to depose Drs. Lunyong and Buis. Denying that request and granting Defendants' three summary judgment motions, the trial court articulated the following oral reasons:
"I've reviewed all of these records. And, quite frankly, it's aI don't think anything you could do in taking these depositions would change the outcome of this case. After a clear review of all the motions for summary judgments and the oppositions that were filed, while my heart goes out to the Williams family, I just don't think that there's anything that would allow you to be successful at trial in connection with this case. I think you've done everything that you could possibly do to try to prosecute this case and to attempt to get experts to assist you in at least raising the issue of malpractice.
But based on everything that's been provided so far, I just don't see that, how you could possibly be successful at trial in any way, shape, or form."
The instant appeal by the Williams followed.

ANALYSIS
On appeal, the standard of review of a trial court's decision granting summary judgment is de novo. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181, 99-2257, p. 7 (La.2/29/00), 755 So.2d 226, 230; Potter v. First Federal Sav. & Loan Ass'n of Scotlandville, 615 So.2d 318, 325 (La.1993). "An appellate court thus asks the same questions as does the trial court in determining whether summary judgment *1053 is appropriate: whether there is any genuine issue of material fact, and whether the mover-appell[ee] is entitled to judgment as a matter of law." Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 26 (La.7/5/94), 639 So.2d 730, 750. We are also guided by the Legislature's admonition that "[t]he summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action" and that "[t]he procedure is favored and shall be construed to accomplish these ends." La. C. Civ. Pro. art. 966 A(2). Nonetheless, in deciding a motion for summary judgment "courts cannot consider the merits, make credibility determinations, evaluate testimony or weigh evidence." Smith, 93-2512 at p. 27, 639 So.2d at 751.
If there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, summary judgment shall be rendered. La. C. Civ. Pro. Art. 966 B. The moving party has the burden of establishing that there are no genuine issues of material fact. La. C. Civ. Pro. Art. 966 C(2).[5] However, Article 966 C(2) now provides that if the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, then the moving party is not required to negate every essential element of the nonmoving party's claim. The moving party may satisfy its burden merely by "pointing out" the absence of support for one or more essential elements of the nonmoving party's claim. "This `pointing out' should be more than a bare assertion, as the mover still bears the burden of proof, which includes the burden of persuasion." Lee v. Wall, 31,468, p. 1 (La.App. 2 Cir. 1/20/99), 726 So.2d 1044, 1047 (Norris, C. J., concurring)(citing David W. Robertson, Summary Judgment and Burden of Proof: Effects of the 1996 Amendment, 45 La. B.J. 331, 333 (1997)).
In meeting the burden of proof, unverified documents, such as letters or reports, annexed to motions for summary judgment are not self-proving and therefore will not be considered; "merely stapling them to a motion for summary judgment" does not "magically" transform such documents into competent summary judgment evidence. Schully v. Hughes, 2000-2605, p. 5 (La.App. 4 Cir. 6/5/02), 820 So.2d 1219, 1222. However, expert opinion testimony in the form of either an affidavit or deposition may be considered in support of a motion for summary judgment. Johnson v. State of Louisiana/University Hosp., XXXX-XXXX, p. 3 (La.App. 4 Cir. 1/16/02), 807 So.2d 367, 369 (citing Independent Fire, supra).
In a medical malpractice case, the medical review panel's opinion is admissible as expert evidence on a motion for summary judgment. Richoux v. Tulane Medical Ctr., 617 So.2d 13, 16 (La.App. 4 Cir.1993). Stated otherwise,"[t]he findings of the medical review panel, whose members are physicians actively working in their fields of expertise, are based on the experts' personal knowledge gained through experience and may be considered in evaluating a summary judgment." Hinson *1054 v. Glen Oak Retirement Home, 34,281, pp. 4-5 (La.App. 2 Cir. 12/15/00), 774 So.2d 1134, 1137 (citing La. R.S. 40:1299.47(H)).[6]
The elements a plaintiff in a medical malpractice action is required to establish are statutorily defined as follows:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
La. R.S. 9:2794 A.[7]
Summarizing, the plaintiff must establish the standard of care applicable to the doctor, a violation by the doctor of that standard of care, and a causal connection between the doctor's alleged negligence and the plaintiff's injuries resulting therefrom. Pfiffner v. Correa, 94-0924, p. 8 (La.10/17/94), 643 So.2d 1228, 1233. To meet this burden of proof, the plaintiff generally is required to produce expert medical testimony. Although the jurisprudence has recognized exceptions in instances of obvious negligence, these exceptions are limited to "instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician's conduct as well as any expert can." Pfiffner, 94-0924 at p. 9, 643 So.2d at 1234; see also Coleman v. Deno, XXXX-XXXX, p. 20 (La.1/25/02), 813 So.2d 303, 317. The jurisprudence has thus recognized that "an expert witness is generally necessary as a matter of law to prove a medical malpractice claim." Williams v. Metro Home Health Care Agency, Inc., XXXX-XXXX, p. 5 (La.App. 4 Cir. 5/8/02), 817 So.2d 1224, 1228. Moreover, the jurisprudence has held that this requirement of producing expert medical testimony is especially apt when the defendants have filed summary judgment motions and supported such motions with expert opinion evidence that their treatment met the applicable standard of care. Lee v. Wall, 31,468, p. 4 (La.App. 2 Cir. 1/20/99), 726 So.2d 1044, 1046-47 (collecting cases).
Turning to the Williams' assignments of error, they first argue that the *1055 trial court erred in granting summary judgment before they could conduct the depositions of two of Drs. Lunyong and Buis. According to the Williams, their attempts to depose these two defendant-doctors were stymied by the defense attorney, who resisted scheduling his clients' depositions. They contend that it was an abuse of discretion for the trial court to grant summary judgment before they could take these depositions.
Addressing a similar issue, this court in Richoux, supra, held that, as a practical matter, the only prerequisite for a trial court to decide a motion for summary judgment, over the nonmoving party's request for a continuance, is that "the parties be given a fair opportunity to present their claim." Richoux, 617 So.2d at 17 (citing Simoneaux v. E.I. du Pont de Nemours and Co., 483 So.2d 908 (La. 1986)). In that case, we held that, despite the lack of a discovery cut-off date, it was not an abuse of discretion for the trial court to refuse to grant a continuance to allow plaintiff to take a deposition and to rule on the motion for summary judgment when it did.
Similarly, in Rhea v. Winn Dixie Market Place Store, 2002-2181 (La.App. 4 Cir. 6/4/03), 849 So.2d 759, cited by Defendants, we reached a similar result. Holding that the plaintiff had ample time to conduct discovery before the court ruled on the defendant's summary judgment motion, we reasoned:
It is the province of the trial court to control the progress of discovery. Where, as here, the plaintiff had adequate time since the filing of the complaint [in July 2001] to secure discovery and was given the opportunity for discovery, there was no abuse of the trial court's wide discretion in discovery matters [in ruling on the motion in August 2002].
Rhea, 2002-2181 at p. 4, 849 So.2d at 762.
Similar principles are codified in Uniform District Court Rule 9.17, which provides:
The court may grant a continuance of a trial or hearing for good grounds. Among the factors the court will consider are the diligence and good faith of the moving party, the reasonableness of the grounds, fairness to both parties, and other litigants before the court, and the need for the orderly and prompt administration of justice.
Rules for Civil (Non-Family or Domestic Relations) Proceedings in District Courts, Rule 9.17; see also La. C. Civ. Pro. Arts. 1601, 1602. As the factors enumerated in this rule reflect, the grant or denial of a continuance is a fact-intense determination over which the trial court has great discretion. In making that determination, the governing principle, as stated in the jurisprudence, is to ensure that before ruling on the motion "the parties be given a fair opportunity to present their claim." Richoux, 617 So.2d at 17.
Applying these principles here, we find the Williams were given a fair opportunity to present their claim before the trial court ruled on Defendants' three summary judgment motions. The record reflects that the underlying medical malpractice occurred in 1996 and 1997. The medical malpractice panel issued its opinion in September 2000, and the Williams filed this suit in November of that same year. Hence, when the trial court ruled on the summary judgment motions almost seven years had elapsed since the occurrence of the alleged medical malpractice, and the suit had been pending for almost three years. At the Williams' request, and over Defendants' strenuous objections, the trial court continued the jury trial date two *1056 times. Likewise, the trial court continued the hearing date on Defendants' motions for summary judgment motion three times. All five of these continuances were granted to allow the Williams additional time, in general, to pursue discovery and, in particular, to depose experts. Given the procedural history of this case, we cannot say that the trial court abused its discretion in denying the Williams' request to continue the hearing date on summary judgment motions.
The Williams' second assignment of error is that the trial court erred in basing its judgment on its subjective beliefs that these depositions would not change the outcome of the case and that the Williams would not prevail at trial. Defendants counter that the trial court simply found the Williams failed to come forward with any expert evidence to establish their case. We agree.
As noted above, because Defendants will not bear the burden of proof at trial, they were not required to negate all the essential elements of the Williams' malpractice action to prevail on their motion for summary judgment; rather, they were only required to "point out" an absence of factual support for one or more elements essential to the Williams' malpractice action. Defendants met their burden of "pointing out" the absence of factual support for the Williams' claims by producing the unanimous finding of the medical review panel as well as affidavits from the individual panel members that Defendants' treatment of the Williams' baby did not fall below the applicable standard of care. Defendants also produced the affidavit of the UNMC surgeon, Dr. Raynor; Dr. Raynor attested that the baby did not have the condition the Williams' experts, Dr. Bohrer and Dr. Koppel, suggested that the baby might have had (i.e., midgut volvulus as a result of malrotation).
Given that Defendants met their "pointing out" burden, the burden shifted to the Williams to produce sufficient factual support to establish that they would be able to satisfy their evidentiary burden at trial. It is undisputed that this is not a case involving obvious negligence; rather, it is conceded that the Williams were required to produce expert medical testimony to establish the applicable standard of care and the breach thereof. Indeed, the reason the trial court granted Defendants' summary judgment motions, as Defendants' emphasize, was because the Williams failed to satisfy their burden of presenting such competent expert evidence.
Although the Williams acknowledge that they did not introduce any competent expert evidence in opposition to Defendants' summary judgment, they argue that the trial court improperly made subjective determinations on summary judgment.[8] That argument is premised on the well-settled principle that it is improper for courts to consider the merits, make credibility determinations, evaluate testimony or weigh evidence on summary judgment. The Williams reliance on that principle in this case, however, is misplaced. This is not a case in which the trial court was presented with divergent expert opinions and made an improper determination that the opinions of one expert were more credible than that of another. This was a case in which the only expert opinions the trial *1057 court had before it were those of the three members of the medical review panel and the surgeon from the UNMC, Dr. Raynor. None of these opinions supported the Williams' position that Defendants' treatment of their baby violated the applicable standard of care. In light of the expert evidence produced by Defendants and the Williams' failure to come forward with countervailing expert evidence to establish a genuine issue of material fact, we find the trial court properly granted Defendants' motions for summary judgment and dismissed this case.

DECREE
For the foregoing reasons, the judgment of the trial court granting Defendants' motions for summary judgment and dismissing this action as to all the parties is affirmed.
AFFIRMED.
NOTES
[1] In July 1997, when the Williams filed their proposed complaint with the Louisiana Patient Compensation Fund, their baby was still alive; the petition alleges that the baby was at Tulane Hospital as of that date. However, some time after the baby was discharged from Children's Hospital, which apparently was in April 1997, the baby died at St. Claude General Hospital following some emergency visits.
[2] A copy of the LPCF's letter was included as an exhibit to the application for emergency supervisory writs filed earlier in this matter, which we denied. 2003C0376 (La.App. 4 Cir. 2/21/03). These four individual nonqualified provider-doctors neither answered the petition nor participated in the protracted pre-trial procedures in this case. We note there is a Motion for Default in the record dated November 2001 as to Dr. Mannick; however, no further action was taken on that matter. Apparently, the Williams are not pursuing these four other doctors other than through their employer, Children's Hospital, as evidenced by the allegation in their amended petition that Children's Hospital "at all times herein the employer of Drs. John Udall, Uwe Blecker, Eberhard Schmidt-Sommerfeld, and Elizabeth Mannick and is therefore liable under the Doctrine of Respondeat Superior for their failure to perform according to the standard of care." This view is still further supported by the fact that the trial court's judgment not only grants the summary judgments filed by Dr. Hill, Memorial Medical Center, Dr. Buis, Dr. Lunyong, and Children's Hospital, but also provides that "this matter is dismissed with prejudice as to all parties."
[3] The LPCF's letter reflects that Memorial Medical Center was self-insured.
[4] Although Memorial Medical Center and Drs. Buis and Lunyong filed an application for emergency supervisory writ from that decision, this court denied the writ, finding "no abuse of the trial court's discretion." 2003C0376 (La.App. 4 Cir. 2/21/03).
[5] La. C. Civ. Pro. Art. 966 C(2) provides:

The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
[6] La. R.S. 40:1299.47(H) provides that the "report of the expert opinion reached by the medical review panel shall be admissible as evidence in any action subsequently brought by the claimant."
[7] The Williams allege liability on the part of Memorial Medical Center and Children's Hospital based on the respondeat superior doctrine. It is well-settled that a hospital is liable for its employee's negligence, including its doctors, under that doctrine. Gibson v. Bossier City General Hosp., 594 So.2d 1332, 1343 (La.App. 2d Cir.1991). The liability imputed to the hospital under that doctrine must be viewed in light of the doctors' actions. Hence, it follows then, that the applicable standard of care as to both the two hospital defendants and the three individual defendants is the same; to wit, the standard set forth in La. 9:2794.
[8] As noted above, the Williams opposed the summary judgment by arguing that they were unable to develop their opposition because they were stymied in their attempts to take the defendant-doctors' depositions. We concluded above, however, that the trial court's refusal to grant the Williams' request for a continuance of the hearing so that they could take those depositions was not an abuse of discretion.