TERRI F. LOVE, Judge.
|, Danielle Larson (“Ms.Larson”) appeals the trial court’s granting of summary judgment in favor of Equest Farm, LLC (“Equest”) and its insurer, dismissing Ms. Larson’s petition for damages due to injuries she suffered from a horse bite. The trial court found Equest was immune from liability pursuant to La. R'.S. 9:2795.3 (“Equine Immunity Statute”) that protects against claims brought by participants engaged in equine activity. The trial court reasoned that feeding and visiting with Equest’s horses constitutes “inspecting” under the statute’s definition of “equine activity.” Because Ms. Larson was “engaged in equine activity” when she sustained her injuries, the trial court found Ms. Larson qualified as a “participant” under the immunity statute. Thus, the trial court concluded that Equest was entitled to immunity and not liable for Ms. Larson’s injuries. We find1 the trial court erred in interpreting the Equine Immunity Statute. Ms. Larson was neither a “participant” or “engaged in equine activity” as defined by the statute. We find Ms. Larson was a “spectator,” which aré excluded from immunity protection. However, - the immunity statute provides an exception wherein a “spectator” may be brought within the purview of immunity protection, which we |2find bars summary judgment. The record demonstrates that there are underlying genuine issues of material fact that are relevant to determining whether the exception, affording immunity protection against a spectator’s liability claims, applies. Therefore, whether Equest is entitled to immunity under La. R.S, 9:2795.3 is a mixed question of law and fact that should be submitted to the trier of fact. Accordingly, we reverse the summary judgment and remand the matter for further proceedings.

PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Since 2000, Equest has leased property in New Orleans.City Park wherein it operates an equestrian facility that boards horses and provides “educational experiences to the citizens of New Orleans,” including camps, lessons, birthday parties, family rides, and field trips. In September 2013, Ms, Larson was in Louisiana, visiting her boyfriend. A few days before September 23, 2013, Ms. Larson went to Equest’s facility to inquire about visiting and feeding the school horses,[1] She spoke with an Equest employee from whom she asked permission to return at a. later date to feed and visit with the school horses. The employee informed Ms. Larson that she was welcome to return and discussed the types of treats Ms. Larson could bring to feed the horses.
On September 23, 2013, Ms. . Larson returned to Equest around 11 a.m, with carrots for the horses. She stopped by the office , first, but it was , .closed. 'She-was I sthen greeted by two horse owners, Joanna Deal (“Ms, Deal”) and Susan Gegen-heimer (“Ms. Gegenheimer”), who board their horses at the facility. The horse owners were grazing their horses when they asked Ms. Larson how they could help her. ■ Ms, Larson explained that she came to visit and feed the school horses after seeking permission a few days earlier from an Equest employee. Neither woman informed Ms. Larson that visitors were prohibited from feeding the horses. Their only, discussion was about the type of food *184 Ms. Larson brought and whether she knew the proper way to feed the horses. Ms. Larson explained that she brought carrots for the horses and demonstrated for the women the correct way to feed a horse. Ms. Larson testified that one of the horse owners warned Ms. Larson that one of the ponies bit a child a few weeks prior. Neither Ms. Deal nor Ms. Gegenheimer identified which “pony” it was that bit someone. However, Ms. Larson testified that she thought if it was something she should be concerned about the Equest employee would have mentioned it when she inquired about visiting and feeding the horses.
After speaking with Ms. Deal and Ms. Gegenheimer, Ms. Larson proceeded into the barn. She fed the first two horses without incident and proceeded to a third horse named Wesley. Ms. Larson testified that Wesley was at the gate of his stall, appeared “normal,” and had a “relaxed disposition.” Ms. Larson extended her hand with the carrot to feed Wesley, but he knocked the carrot from her hand which landed on the ground just outside the stall by Ms. Larson’s foot. When Ms. Larson bent down to pick the carrot up Wesley reached for the carrot at the same |4time with his mouth -from under the gate of the stall. Ms. Larson testified that she was not sure if she had the carrot in her hand when Wesley reached for it, but she recalled being pulled by her hand against the gate of Wesley’s stall. At which point, Wesley bit off Ms. Larson’s thumb. According to Ms. Larson’s petition, the resulting injury requires either a prosthetic thumb or a transposition of her big toe in the future.
Ms. Larson testified that she did not recall seeing any signs or warnings that prohibited visitors from feeding the horses. She also noted that she could not make out the names of the horses on the signs in front of their stalls and did not recall seeing any warnings about any of the horses. Moreover, both horse owners Ms. Larson spoke to that day were deposed. Neither horse owner recalled seeing warning signs prohibiting visitors from touching or feeding the horses. Both horse owners stated that they frequent the Equest facility several times a week, if not every day, to tend to their horses. Ms. Deal testified that several times a week she has witnessed visitors come to feed the horses. She was not aware of any rule in place preventing visitors from feeding the horses. However, Ms. Deal stated she did recognize a change in policy after Ms. Larson’s injury. Ms. Deal testified that afterwards Equest instructed all of its boarders to inform visitors that they are not to feed the horses. Ms. Gegenheimer testified similarly, noting that up until the time Ms. Larson was injured, “outside people who didn’t own horses” would bring food to feed the horses.
|aAs a result of Ms. Larson’s injuries, she filed a petition for damages against Equest and its insurer in January 2014. Equest filed a motion for summary judgment in January 2015 on the basis that it is protected from liability under La. R.S. 9:2795.3, the Equine Immunity Statute. Equest claims that Ms. Larson qualifies as a “participant” under the statute because she engaged in “equine activity.” Equest contends that Ms. Larson is considered a “participant” because she went to “see” and feed the horses, which it argues constitutes “engaging in equine activity.” Because the statute provides immunity from liability when a participant is injured while engaging in equine activity, Equest claims it is entitled to summary judgment.
In opposition to the motion for summary judgment, Ms. Larson asserts that the statute upon which Equest relies must be strictly construed because it grants immu *185 nity in derogation of a tort victim’s general rights. Consequently, Ms. Larson avers that she is not a “participant” under La. R.S. 9:2795.3 because she was not involved in any of the activities defined as “equine activity” under subsection (A)(3). Ms. Larson claims that she was only a “spectator” and not engaged in equine activity. Therefore, the statute by its terms does not apply and as a matter of law Equest is not entitled to summary judgment based on immunity.
Ms. Larson further asserts that even if the statute applies, which she contends it does not, summary judgment is precluded because the evidence proves genuine issues of material fact still exist. Despite the immunity statute’s exclusion of spectators, Ms. Larson acknowledges certain exceptions may apply to spectators |fifrom which an equine activity sponsor may be protected from liability. Whether immunity applies under one of the exceptions depends on the resolution of material facts that remain in dispute. Consequently, Ms. Larson asserts that summary judgment is inappropriate.
After a hearing on Equest’s motion, the trial court granted summary judgment, stating:
I believe that ... when you' went to feed that horse it was equine activity. You’re not a spectator ... somebody could say that its inspecting. I don’t know. Evaluating, I don’t know...
I think the Fourth Circuit needs to look at it. The Fourth Circuit needs to tell me it was equine activity. •...[2]
The trial court signed the judgment on April 7,2015, that granted Equest’s motion for summary judgment and dismissed Ms. Larson’s petition for damages. Ms. Larson’s appeal to this Court follows.

STANDARD OF REVIEW

“An appellate court reviews a trial court’s decision granting summary judgment de novo using the same standard applied by the trial court in deciding the motion for summary judgment.” St. Bernard I, LLC v. Williams, 12-0372, p. 5 (La.App. 4 Cir. 3/13/13), 112 So.3d 922, 926 (internal citations omitted). Therefore, |7an appellate court asks the'same questions as the trial court in its determination of whether summary judgment is appropriate, including: “whether there is any genuine issue of material fact, and whether the mover-appell[ee] is entitled to judgment as a matter of law.” Id. (citing Williams v. Mem'l Med. Ctr., 03-1806, p. 13 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044, 1052-53).
Moreover, “[t]he judgment sought shall be rendered forthwith if the pleadings, de *186 positions, answers to interrogatories, and admissions, together with the , affidavits, if any, show that there is no genuine issue as to material fact,, and that mover is entitled to judgment as a matter of. law.” La. C.C.P. art. 966(B)(2), The burden of proof remains with the m'ovant.
However, if the movant will not bear the burden of proof at trial on the matter that is before’the court on the motion for summary' judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an' absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue .of material fact.
La. C.C.P. art. 966Q(2).
Ms. Larson’s status as a “participant” under the Equine Immunity Statute is a mixed question of law and fact. “Interpretation of statutory terms is a question of law. If reasonable persons applying the proper legal standard could differ as to whether [Ms. Larson] was a [participant], status becomes a question for the jury. Only where the undisputed facts reveal that [Ms. Larson engaged in equine activity], may the court take the question from the jury by granting summary judgment.” Waller v. American Seafoods Co., 97-0302, p. 2 (La.App. 4 Cir. 10/1/97), 700 So.2d 1306, 1307-08 (internal citations omitted).
IsThe question before us is whether the trial court legally erréd’in concluding Ms. Larson was a participant under the Equine Immunity Statute and whether the'trial court properly granted summary judgment in Equest’s favor dismissing Ms. Larson’s claims. • ■ ,

LAW AND ANALYSIS

La. R.S.9:2795,3(B) provides in pertinent part:
. Except as provided in Subsection C of this Section, an equine activity sponsor ... shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities and, except as provided in Subsection C of this Section, no participant ;,. shall make any claim against, maintain an action against, or recover from an equine activity sponsor ... for injury, loss, damage, or death resulting from any of the inherent risks of equine activities.
(emphasis added). There is no dispute that Equest is an “equine activity sponsor” and that Wesley is an “equine” as defined under the statute. The statute further states “[e]quine activity includes, any or all of the following: ”
(a) An equine shoiv, auction, fair, race, competition, performance, parade, or carriage ride that involves any or all breeds of equine and any of the equine disciplines, including but not limited to any dressage, hunter and jumper horse show, grand prix jumping, three-day event, combined training, rodeo, driving, pulling, cutting, polo, steeplechasing, English and western performance riding, endurance trail riding and western game, racing, and hunting.
(b) Equine training or teaching activities, or both.
(c) Boarding equine.
(d) Riding, inspecting, or evaluating an equine belonging to another, whether 'or not the owner has received some monetary consideration or other thing of value for the use of the equine or is permit *187 ting a prospective purchaser of the equine to ride, inspect,'.or evaluate the equine.
(e) ride, trip, hunt, or other equine activity of any type however informal or impromptu that are sponsored by an equine activity sponsor.
La. R.S. 9:2795.3(A)(3) (emphasis added). La. R.S. 1:3 states,
lfl“Words and phrases shall be read with their context and shall be construed according to the common and approved usage .of the language. Technical words and . phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and appropriate meaning.”
Moreover, “[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.” La. C.C. art. 9. Similarly, “[statutes ... that grant immunities or advantages to special classes in derogation of the general rights available to tort victims, must be strictly construed against the party claiming the immunity or advantage.” Medine v. Geico Gen. Ins. Co., 97-2393, p. 4 (La.App. 4 Cir. 11/17/99), 748 So.2d 532, 535.
Ms. Larson contests the trial court’s ruling that by visiting and feeding Equest’s school horáes, she was a “participant” in equine activity for the purposes of statutory immunity. Ms. Larson asserts she was not a “participant” but a “spectator.” We agree, finding the trial court erred in interpreting, the Equine Immunity Statute. The trial court mistakenly concluded that Equest was entitled to immu-. nity because the trial court applied an overly broad interpretation of the statute’s definition of “equine activity.” We find the trial court’s overly broad interpretation of “equine activity” is ' inconsistent with principles of statutory- interpretation.
The Equine Immunity Statute applies by its express terms to participants. The statute defines “participant” as “any person, whether amateur or professional, who engages in an equine activity_” La. R.S. 9:2795.3(A)(7). In addition to defining “equine activity” the statute also defines “Engages in Equine activity” as:
riding, training, racing, driving, providing farrier services, providing or assisting in providing medical treatment of, .or being a passenger Imupon an equine, whether mounted or unmounted, or.any person assisting a participant or show management. The term “engages in an equine activity” does not include being a spectator at an equine activity, except in cases where the spectator places ■himself in an unauthorized area. and in immediate proximity to the equine activity.
La. R.S. 9:2795.3(A)(1) (emphasis added). A strict interpretation of the statute shows that the definition of “engages in equine activity” is intended to be read within the context of its use in the definition of “participant.” Murrell v. Hooter, 04-960, p. 8 (La.App. 5 Cir. 12/28/04), 892 So.2d 680, 685 (Interpreting identical language construction .in the. farm animal .immunity statute), ... ,
, The definition does not include a visitor to a stable who feeds treats to a horse, A review of the statute demonstrates, in fact, that, there is no mention of feeding at all. Ms. Larson points out that the trial court’s reasoning suggests • that “every ■ single horse-related; activity yields immunity.” Ms. Larson contends if this was the legislature’s intent, there would be no need to list the specific activities to which the Equine Immunity Statute applies.[3] Fur *188 ther, the legislature could have chosen to indicate that the list of equine activities was merely illustrative and not exhaustive. The fact that it did not is evidence of the legislature’s intent to limit the activities to which the statute extends immunity protection. Similarly, a broad interpretation of the definition of “engages in equine activity” is unwarranted as evidenced by the statute’s own terms, extending immunity protection strictly to “participants” and expressly excluding “spectators.”
In this case, it is undisputed that Ms. Larson was not engaged in any of the activities listed under subsection (A)(1). Additionally, the definition of “engages in an equine activity” expressly excludes the act of “being a spectator.” Given Ms. _JjjLarson was not a “participant who [was engaged] in an equine activity,” Ms. Larson avers'she was merely a “spectator.” Before addressing Ms. Larson’s status as a spectator, we first address the trial court’s suggestion that Ms. Larson’s actions constitute “inspecting” or “evaluating” under the statute’s definition of “equine activity” pursuant to La. R.S. 9:2795.3(A)(3)(d). ■
Equest avers that the immunity statute broadly defines “equine activity,” which includes “any or all of’ the activities defined in subsection (A)(3). For this reason, Equest claims Ms. Larson ignores the definition of “equine activity” and instead “focuses on the more narrow definition of ‘engages in an equine activity” ” in subsection (A)(1). Equest claims a more appropriate interpretation of “participant” under the statute would include consideration of the statute’s definitions of “equine activities” and “inherent risks of equine activities.” Equest directs this Court’s attention to La. R.S. 9:2795.3(A)(3)(d) that includes within the definition of “equine activity”:
Riding, inspecting, or evaluating an equine belonging to another, whether or not the owner has received some monetary consideration or other thing of value for the use of the equine or is permitting a prospective purchaser of the equine to ride, inspect, or evaluate the equine.
(emphasis added).
We note that the statute does not define “inspecting” or “evaluating,” nor does Equest offer a definition to demonstrate how Ms. Larson’s actions constitute “equine activity” under this particular subsection. Equest only claims that Ms. Larson was “inspecting” the horses at the time of the incident because Ms. Larson testified that she wanted to “see” the school horses, give them “love and affection and talk to them,” and to feed them treats.
|12Where the statute does not define a term, we assume that it retains its common meaning. Vogt v. Board of Levee Com'rs of Orleans Levee Dist., 95-1187, p. 10 (La.App. 4 Cir. 9/4/1996), 680 So.2d 149, 155. Merriam-Webster’s Collegiate Dictionary, Tenth. Edition (1999) defines “inspect” as “to view closely in critical appraisal” or “to examine officially”; also defining “inspection” as “a checking or testing of an individual against established standards.” Equally, it defines “evaluate” as “1: to determine or fix value of 2: to determine the significance, worth, or condition of usu. by careful appraisal and study.” Moreover, these definitions of “inspecting or evaluating” make sense within the context of the rest of subsection (A)(3)(d), which pertains to the purchase and sale of an equine.
*189 We find the act of visiting Equest’s horses to give them “love and affection” and to feed them treats does not align with the common and approved usage of “inspecting” or “evaluating” under the statute. Likewise, Ms. Larson testified that she wanted to “see” the horses. In light of her testimony describing her purpose for wanting to “see” the horses, we find Equest’s attempts to liken the act of “see[ing]” the horses to “inspecting or evaluating” under subsection (A)(3)(d) is without merit. Ms. Larson’s undisputed testimony proves her only purpose for being at Equest was to visit and feed the school horses. We agree “equine activities,” as defined in subsection (A)(3) was intended to be considered within the context of the definition of a “participant.” However, we find Equest’s interpretation adds to the existing statute, in a way that improperly enlarges the scope of equine activities from which an equine activity sponsor is immune from liability.
11aGiven immunity statutes “must be strictly construed as making the least rather than the most change in preexisting general law,” we reject Equest’s interpretation as it is contrary to the principles of statutory .construction. Monteville v. Terrebonne Parish Consol. Gov’t, 567 So.2d 1097, 1102 (La.1990). We find Ms. Larson’s actions do not constitute “inspecting” or “evaluating” under subsection (A)(3)(d). Additionally, Equest fails to point to any other defined “equine activity” that applies to Ms. Larson;[4] therefore, we turn our attention to Ms. Larson’s claim that she was a “spectator.”
Although the immunity statute applies only to “participants” and excludes spectators, Ms. Larson acknowledges certain exceptions may apply which provide immunity protection against a spectator’s liability claim. Pursuant La. R.S. 9:2795.3(A)(1), if a spectator “places himself in an unauthorized area and in immediate proximity to equine activity” for purposes of immunity protection, a spectator is considered a “participant.” La. R.S. 9:2795.3(A)(1). The question becomes whether the exception applies to Ms. Larson, despite her status as a “spectator,” that entitles Equest to immunity protection.
Ms. Larson indicates that even if an exception applies, which she contends it does not, summary judgment is barred because genuine issues of material fact | Mexist. She asserts that whether immunity applies under one of the exceptions[5] depends on the resolution of underlying material facts that remain in dispute. Among the disputed issues of material fact is whether Ms. Larson was a spectator, whether she was in an unauthorized area, and whether Equest had signs prohibiting visitors from feeding the horses.
*190 Ms. Larson 'testified that a few days before the incident she visited Equest and spoke with an employee. She asked if it was okay to return later in the week to visit with the horses and bring them treats. Ms. Larson said the purpose of her initial visit was to seek permission to visit and feed the school horses and to learn what type of treats she should bring. The employee, who Ms. Larson believed was named Kiley or Kaley, gave her permission to- return later in the week. Ms. Larson testified that the Equest employee said any of the treats Ms. Larson suggested would be fine and only told Ms. Larson that when she returns to come before 4:00 p.m. because classes started at that time.
Ms. Larson testified that when she returned on September 23, 2013, the office was closed', but she spoke with Ms. Deal and Gegenheimer. Ms. Larson explained to the horse owners her purpose for visiting and that she previously received, permission from an Equest employee. Ms. Larson testified that she did not see any signs prohibiting visitors from touching or feeding the horses.
Further, Ms. Deal testified that “no feeding” signs were posted periodically at Equest, but were not permanent. However, Ms. Deal stated that on September. 23, 2013, she did-not recall seeing any signs prohibiting . visitors from feeding or | ^touching the horses. Likewise, Ms. Ge-genheimer testified that she did not recall any rule, instructions, or warnings prohibiting visitors from feeding the horses. Ms. Gegenheimer also testified that she did not recall any warnings about Wesley having previously bit someone. Conversely, Leslie Kramer testified that prior to Ms. Larson’s visit in September and on the day of Ms. Larson’s accident, Equest had signs prohibiting visitors from touching or feeding of its horses. ■ Ms, Kramer stated that “[m]ultiple signs have been posted since 2011 stating that no treats ‘of any kind are to be fed to the horses and ponies on this property.’ ”
Ms. Larson contends these disputed facts are relevant to a determination of whether the immunity statute has' any application in this case.' The immunity statute has no application insofar as we find Ms. Larson does not fit the definition' of a “participant” “engaged in equine activities.” However, even as a “spectator,” Ms. Larson may be brought within the purview of the immunity statute if she was in an unauthorized area and in close proximity to equine activity. Therefore, the question of whether Ms. Larson had permission and whether signs were posted prohibiting visitors from touching or feeding the horses is relevant. Viewing the evidence in a light most favorable to the plaintiff, we find the question of whether the immunity statute applies to Ms. Larson as a spectator should be submitted to the trier of fact.

DECREE

■ Accordingly, we find the trial court erred in deciding as á matter of law that based on Ms. Larson’s actions she was a “participant” “engaged in equine activity,” and not a “spectator.” Moreover, we find that genuine issues of material fact exist, resolution of which will determine whether Equest is entitled to immunity, Therefore, we find the granting of summary judgment inappropriate. L’ñThe trial court’s granting of summary judgment is reversed and the matter is remanded for further proceedings.
REVERSED AND REMANDED
LOBRANO, J., concurs in the result and assigns reasons,

. Equest states that it houses 68 horses of which 20 are "school horses” owned 'by Equest. The school horses "are available for local children and adults who want to take riding lessons but who cannot afford to own a horse.”’ The pony at issue in this case is an Equest-school horse it has owned since 2011.

. Ms. Larson notes in her appellate brief'that the trial court granted summary judgment "based on the stated uncertainty that Ms. Larson’s actions could be considered inspecting or evaluating.” Although the trial court granted Equest’s motion for summary judgment, its ruling is unclear. The trial, court at first finds Ms. Larson’s actions of feeding and visiting the horses constitute "inspecting” or "evaluating” under the statute, However, immediately after stating its finding on the record the trial court second guesses its ruling, suggesting that "inspecting” or "evaluating” does not apply and that feeding and visiting is not “equine activity.” The trial court’s statement that "the Fourth Circuit needs to tell me it was equine activity,” further evidences the trial court’s retreat from its initial finding.
In that this Court reviews summary judgments de novo, we do not defer to the trial court’s reasoning. A trial court is charged with the duty to interpret and apply the law. Trial courts should be cautious of basing 'its decisions on the flip of the proverbial coin and awaiting direction from an appellate court rather than the exercise of the trial court’s judgment. To do otherwise threatens the value of the trial court’s judicial independence.

. In 2006, for example, the legislature amended the statute to add "racing” to the definí *188 tion of "equine activity.” See La. Acts 2006, No. 136, § 1. The amendment underscores the notion that the legislature did not intend to cover all horse-related activity.

. Equest claims that because a horse bite is an inherent risk of being around horses, as defined under La. R.S. 9:2795.3(A)(6), "the facts of this case fall squarely within” the Equine Immunity Statute, and therefore, Equest cannot be held liable. We find no merit to Equest’s contention as immunity applies only to "participants.” See La, R.S, 9:2795.3(B). Regardless of whether being bitten by a horse is an inherent risk of "equine activity,” the first inquiry is whether Ms. Larson was a "participant” and whether she "engaged in an equine activity.” In that we find Equest has not proved Ms. Larson was a "participant” in engaged in one of the enumerated equine activities, we find no reason to discuss Equest’s “inherent risk argument.”

. Ms. Larson contends that resolution of underlying material facts will also determine whether exceptions under subsections (C)(2) and (C)(3) apply. In that we find Ms. Larson is not a "participant” and these exceptions pertain only to a "participant,” we pretermit discussion of these arguments.